IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

CHARLES E. SCHEMELIA, JR.,

     Plaintiff,

         v.

COMMISSIONER OF SOCIAL SECURITY,

     Defendant.

Civil No. 16-3225 (RMB)

**OPINION**

Appearances:

Richard L. Frankel, Esq.
Bross & Frankel, PA
102 Browning Lane, Bldg. C-1
Cherry Hill, New Jersey 08003

    *Attorney for Plaintiff*

Lauren Donner Chait, Esq.
Meriah Russell, Esq.
Social Security Administration
Office of the General Counsel
300 Spring Garden Street
Philadelphia, Pennsylvania  19123

    *Attorneys for Social Security*

**BUMB, United States District Judge:**

This matter comes before the Court on an appeal from a final administrative decision by the Commissioner of Social Security which denied benefits to Plaintiff Charles Schemelia ("Plaintiff"). (Administrative Record ("AR") 25-26).  On June 5, 2017, this Court conducted oral argument.  For the reasons set

forth below, the case will be remanded on a limited basis for further proceedings.

## I.  <u>PROCEDURAL BACKGROUND</u>

Plaintiff applied for Social Security Disability Benefits on February 7, 2012, alleging a disability onset date of August 22, 2010.  (AR 15, 58).  His complained of conditions are vertiginous syndromes and other disorders of the vestibular system including severe vertigo and fractures of his lower right limb resulting in plates with pins and screws in his leg. (<u>Id.</u> at 58, 70).  Plaintiff's claim was denied on July 17, 2012 and on December 14, 2012, reconsideration was also denied.  (<u>Id.</u> at 84, 95-97). Thereafter, Plaintiff requested a hearing, which was held on March 11, 2014. (<u>Id.</u> at 31-56).  At that hearing, Plaintiff amended his alleged onset date from August 22, 2010 to February 7, 2012.  (<u>Id.</u> at 15).  The hearing resulted in a July 24, 2014 decision finding that Plaintiff was not disabled.  (<u>Id.</u> at 12-30).  The Appeals Council denied review of this decision on March 31, 2016, (<u>id.</u> at 1-5), and Plaintiff thereafter commenced the instant appeal before this Court pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  (Compl. [ECF No. 1]).

## II.  <u>FACTUAL BACKGROUND</u>

Plaintiff's alleged disability seems to have arisen primarily from a car accident in August 2010.  (AR 237-243, 254-

77, 300-07).  In addition to fracturing his right leg in that accident, some degree of head trauma was noted, and his medical records indicate that he felt dizzy.  (Id. at 271-72).  A CT scan performed showed no acute intercranial abnormality, however. (Id. at 237, 257).  He was discharged on August 24, 2010 and given instructions to follow up on treatment for his injured leg.  Soon thereafter, he underwent surgery on his leg by Dr. Brady, which inserted pins and screws into his right knee.  (Id. at 308-10, 331-32).

Plaintiff was back in the emergency room several weeks later, on September 17, 2010, with complaints of dizziness and the inability to taste food, which Plaintiff attributed to the earlier car accident. (Id. at 244-253, 320-330).  He complained of dizziness for the preceding 3-4 weeks, with his two worst days being the two days prior to the ER visit. (Id. at 250).  At that time, Plaintiff's symptoms were attributed to acute vertigo with a diagnosis of post-concussive syndrome.  He was prescribed Mezclizine, Valium, and Phenargen. (Id. at 249, 251).

Over the ensuing months, Plaintiff continued to be treated by Dr. Brady for his leg fracture.  On November 11, 2010, Dr. Brady noted that Plaintiff suffered from decreased mobility, stiffness, swelling, difficulty going to sleep and nighttime awakening.  (Id. at 314).  Dr. Brady continued Plaintiff's prescriptions for Dilaudid and Vistenl for the pain.  (Id. at

314).  During this time, Plaintiff was also undergoing physical therapy for his leg. (Id. at 278-298).

In March 2011, Plaintiff saw a neurologist, Dr. Townsend, who noted Plaintiff's many complaints and offered a diagnosis of post-concussion syndrome.  (Id. at 442-444).  Plaintiff complained of vertigo all the time and that he "can't lie in bed facing the light.  He  can't look up either.  He notes that the vertigo will last 30 seconds or so.  He has a feeling like he is in a haze all the time.  Getting out of bed makes it worse." (Id. at 442).  Plaintiff complained of a host of other symptoms including memory issues, irritability, food tasting wrong, and positional discomfort. (Id.)  Many of these same complaints persisted at a later meeting with Dr. Townsend on May 16, 2011, and several treatment sessions thereafter.  (Id.)

On October 3, 2011, Plaintiff was then referred to Dr. Greenberg for a psychological evaluation for memory complaints. (Id. 429).  Dr. Greenberg, after an interview with Plaintiff, drafted a comprehensive report that assessed Plaintiff on many levels.  The report concluded that Plaintiff was suffering from at least mild depression.  (Id. at 430).  Later that month, Dr. Townsend corresponded with the State of New Jersey Department of Labor and Workforce Development, Division of Disability Determination Service ("DDS") and confirmed that he had been

treating Plaintiff for post-concussion syndrome, head injury, vertigo, memory issues, and sleep issues.  (Id. at 458-61).

In February 2012, Dr. Greenberg responded to DDS that Plaintiff did not return for neuropsychologic testing, however, the same letter confirms that his preliminary diagnoses were post-concussion syndrome and memory loss.  (Id. at 455).

Plaintiff underwent a consultative examination of his right leg complaints in June 2012, and at that time Dr. Bagner found no physical limitations.  (Id. at 472-75).  Specifically, Dr. Bagner noted that "the patient ambulates at a reasonable pace with a mild right limp, gets on and off the examining table without difficulty, and dressed and undressed without assistance.  He is not uncomfortable in the seated position during the interview, does not use a cane or crutches, can heel and toe walk. . . .  There is pain on movement of the right knee.  The right knee shows a normal range of movement."  (Id. at 472-73).  However, the report did indicate problems with dizziness. (Id. at 472).

On December 8, 2012, Dr. Villare examined Plaintiff on behalf of the New Jersey Division of Family Development.  That report indicated that Plaintiff had anxiety and memory loss issues and noted that Plaintiff was totally disabled.  (Id. at 476-77).

Over a year later, Plaintiff was seen by Dr. Sheehan who noted Plaintiff's cognitive defects and diagnosed him with post-concussion syndrome. (Id. at 478-82). This diagnosis was confirmed by Dr. Maltz, who saw Plaintiff in May 2014 and noted the condition was exacerbated by post-injury sleep disorder and post-traumatic psychological and emotional issues. All of this combined resulted in a "downward spiral" in his neurocognitive and psychological functioning. (Id. at 489). "In any case, it is clear that Mr. Schemelia is not functioning at the level that he did prior to his accident and he is experiencing ongoing disabling neuropsychological deficits." (Id.)

At his hearing before the ALJ, Plaintiff testified concerning the range of his symptoms. (Id. at 31-56). This testimony included his problems with vertigo and cognitive deficits. (Id. at 39 ("Certain days I'll wake up and it's like I had the accident that day and I'll vertigo anywhere from a day to three days. I kind of feel like I'm on the inside looking out in a tunnel."); id. at 49 ("It's just stupid stuff like I almost broke into tears because I changed [a]n outside light, and I lost my tools and it took like an hour and a half to two hours to do something that normally would take me 15 minutes")). Additionally, Plaintiff testified that he is limited to 4-6 hours of "terrible" sleep a night as he struggles to get comfortable between his vertigo and painful leg. (Id. at 42,

49-50). Plaintiff complained as well of everyday headaches, the inability to drive, walk, sit, and use stairs in a normal manner. (Id. at 38, 44, 47-48).[1]

## III. **ALJ DECISION**

At Step One, the ALJ determined that Plaintiff's earning records show that he had no income since 2002. Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (AR 17). At Step Two, the ALJ determined that Plaintiff had the following severe impairments: status post right tibial fracture, status post open reduction and internal fixation, post-concussion syndrome, and traumatic brain injury. (Id.) At Step Three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Id. at 17-19). Having determined that Plaintiff did not have a listed impairment, the ALJ then formulated a Residual Functional Capacity ("RFC") for Plaintiff. The ALJ determined that

---

[1] The ALJ also heard testimony at the hearing from medical expert Dr. Cohen. Dr. Cohen analyzed Plaintiff's traumatic brain injury. However, Dr. Cohen testified that he could not fully opine on his disability status without more information, such as a neuropsychological evaluation. (AR 54). Plaintiff subsequently underwent that examination with Dr. Maltz to satiate Dr. Cohen's criticisms, who determined that Plaintiff suffered a severe level of depression and was experiencing ongoing disabling neuropsychological deficits. (Id. at 489); see infra.

Plaintiff possessed the RFC to: perform light work as defined in 20 CFR 416.967(b) except he can never climb ladders, ropes or scaffolds; he can occasionally climb stairs, stoop, kneel, crouch or crawl; he can frequently balance; he must avoid all exposure to unprotected heights, moving mechanical parts, or vibration; and he is limited to unskilled work, involving simple, repetitive tasks and one to two step instructions. (Id. at 19). Then, at Step Four, the ALJ determined that Plaintiff was unable to perform any past relevant work based upon this RFC. At Step Five, with the burden having shifted off of Plaintiff, the ALJ determined that Plaintiff was able to perform many jobs in the national economy and was therefore not disabled. (Id. at 25).

## IV.  STANDARD OF REVIEW

When reviewing a final decision of an ALJ with regard to disability benefits, a court must uphold the ALJ's factual decisions if they are supported by "substantial evidence." Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000); 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" means "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Cons. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir.1999).

8

In addition to the "substantial evidence" inquiry, the court must also determine whether the ALJ applied the correct legal standards.  See Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000).  The Court's review of legal issues is plenary.  Sykes, 228 F.3d at 262 (citing Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999)).

### "Disability" Defined

The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The Act further states,

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated a five-step, sequential analysis for evaluating a claimant's disability, as outlined in

20 C.F.R. § 404.1520(a)(4)(i-v). In Plummer, the Third Circuit

described the Commissioner's inquiry at each step of this

analysis:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § 1520(a). If a claimant is found to be engaged in substantial activity, the disability claim will be denied. Bowen v. Yuckert, 482 U.S. 137, 140 (1987).
>
> In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that [his] impairments are "severe," [he] is ineligible for disability benefits.
>
> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.
>
> Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform [his] past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to [his] past relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994). If the claimant is unable to resume [his] former occupation, the evaluation moves to the final step.
>
> At this [fifth] stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with [his] medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in

> determining whether [he] is capable of performing work
> and is not disabled. See 20 C.F.R. § 404.1523. The ALJ
> will often seek the assistance of a vocational expert at
> this fifth step. <u>See</u> <u>Podedworny v. Harris</u>, 745 F.2d 210,
> 218 (3d Cir. 1984).

186 F.3d at 428.

## V.   <u>ANALYSIS</u>

Plaintiff first contends that the ALJ erred in failing to

perform a function-by-function assessment of RFC as required by

SSR 96-8p:  "At Step 5, the ALJ determined that Mr. Schemelia

'has the residual function capacity to perform a range of light

work' with non-exertional limitation.'  But in so doing, the ALJ

expressed Mr. Schemelia's RFC in terms of an **exertional category**

**only** and completely failed to address the exertional limitations

of sitting, standing, walking, lifting and carrying." (Pl.'s Br.

18-19 (citation omitted)).

SSR 96-8p provides:

> **The RFC assessment must first identify the**
> **individual's functional limitations or restrictions**
> **and assess his or her work-related abilities on a**
> **function-by-function basis, including the functions in**
> **paragraphs (b), (c), and (d) of 20 CFR 404.1545 and**
> **416.945.** . . In assessing RFC, the adjudicator must
> discuss the individual's ability to perform sustained
> work activities in an ordinary work setting on a
> regular and continuing basis (i.e. 8 hours a day, for
> 5 days a week, or an equivalent work schedule), and
> describe the maximum amount of each work related
> activity the individual can perform based on the
> evidence available in the case record. . . Therefore,
> it is necessary to assess the individual's capacity to
> perform each of these functions in order to decide
> which exertional level is appropriate and whether the
> individual is capable of doing the full range of work

contemplated by the exertional level. . . . Without a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have.

Id. As Plaintiff identifies, Sections (b), (c), and (d) of 20 C.F.R. § 404.1545 include the following functions: sitting, standing, walking, lifting, carrying, pushing, stooping, and crouching.

In this case, the ALJ determined that Plaintiff possessed the RFC to perform light work as defined in 20 C.F.R. § 416.967(b) except he can never climb ladders, ropes or scaffolds; he can occasionally climb stairs, stoop, kneel, crouch or crawl; he can frequently balance; he must avoid all exposure to unprotected heights, moving mechanical parts, or vibration; and he is limited to unskilled work, involving simple, repetitive tasks and one to two step instructions. 228 F.3d at 262 19). 20 C.F.R. § 416.967 dictates that Light Work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of

performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  Id.

"[T]he ALJ's findings of residual functional capacity must 'be accompanied by a clear and satisfactory explanation of the basis on which it rests.'"  Faragnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001) (quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)).

Plaintiff relies on Mines v. Colvin, Civ. A. No. 14-2792 (JBS), 2015 WL 3902301, at *13 (D.N.J. June 24, 2015), a case that seems similar to the current case.  In Mines, the court observed: "Plaintiff does not argue that the RFC assessment of 'light work' is unsupported by substantial evidence.  Plaintiff contends that it is impossible for her to meaningfully review and challenge the ALJ's RFC determination because the ALJ failed to perform a function-by-function analysis."  Id.  The court, agreeing with Plaintiff, ruled that the "ALJ did not properly consider the medical record for Plaintiff's ankle disorder in the RFC assessment.  Here, although the ALJ referenced most of the relevant medical record, he ignored or discounted portions of the record without explanation.  In reviewing Plaintiff's

testimony at the hearing, the ALJ acknowledged Plaintiff's reports of difficulty walking, sitting, kneeling, and climbing stairs, but did not make any reference to Plaintiff's statements about her ankle problems, which Plaintiff mentioned several times throughout the hearing." Id. The Court went on, "[the plaintiff] testified that she starts to feel pain in her ankle within 10 to 20 minutes of walking." Id. The case was remanded for further consideration of these issues.

Defendant responds that the ALJ, unlike in Mines, did consider Plaintiff's claimed limitations. Specifically, the ALJ considered Plaintiff's claims but found them not credible. The Court agrees with Defendant. As the ALJ set forth in his opinion, "The undersigned finds that while the medical evidence shows that claimant sustained a right tibia fracture, there [was] no treating evidence beyond January 2011, just 5 months after his accident, to corroborate claimant's allegations of limitations resulting from same." (AR 24). The Court finds this consideration by the ALJ to be substantial evidence upon which to base the RFC determination. Accordingly, the ALJ did not err as alleged by Plaintiff in this regard.

The Court does agree with Plaintiff, however, that the ALJ erred in assigning an RFC which included non-exertional limitations, but failed to consult a vocational expert to determine the effect additional limitations had on the

occupation base: "[T]he ALJ erred by not providing a function-by-function analysis of the Plaintiff's exertional capacity as required by SSR 98-6p. The error is further compounded by the fact that the ALJ included additional non-exertional limitations which were never posed to a vocational expert. There is no vocational opinion on whether these non-exertional limitations would impact Mr. Schemelia, nor did the ALJ provide any notice of his intent to take Judicial Notice that the additional limitations would not impact the occupational base." (Pl.'s Br. 23). Because, the RFC contained non-exertional limitations, Plaintiff argues the ALJ cannot rely exclusively on the grids to make a decision pursuant to AR 01-1(3), but must instead take or produce vocational evidence.

Defendant responds that where no specific rule applies, the grids still provide a framework, such as in cases involving combinations of exertional (strength) and non-exertional (non-strength) limitations. (Def.'s Br. at 14-15). AR 01-1(3) establishes that there is no need to call a vocational expert when the ALJ relies on "an SSR that includes a statement explaining how the particular non-exertional limitation(s) under consideration in the claim being adjudicated affects a claimant's occupational job base." (Def.'s Br. 16).[2] In this

---

[2] As Defendant notes "Section 200.00(e)(2) of 20 C.F.R. Part 404, Subpt P, Appendix 2 provides that when an individual has an

case, the ALJ relied upon two SSRs, 83-14 and 85-15, which discuss non-exertional limitations and their effect on the occupational base.

To carry the burden at Step Five, the ALJ may utilize the Medical–Vocational Guidelines set forth in 20 C.F.R. Part 404, Subpart P, Appendix 2. See generally Rojas-Velez v. Comm'r of Soc. Sec., Civ. No. 16-1324 (RMB), 2017 WL 969969, at *9 (D.N.J. Mar. 13, 2017). The Third Circuit has indicated, "[t]he grids [in the Medical-Vocational Guidelines] consist of a matrix of four factors—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." Sykes, 228 F.3d at 263. "Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion that work exists that the claimant can perform." Id.

Where a claimant has both exertional and non-exertional limitations (as does Mr. Schemelia), the ALJ cannot rely upon

_____

impairment or combination of impairments 'resulting in both strength limitations and nonexertional limitations,' the grid rules are first used to determine whether a finding of disabled is possible based on the strength limitations alone. If not, 'the same grid rules reflecting the individual's maximum residential strength capabilities, age, education, and work experience are used as a framework for consideration of how much the individual nonexertional limitations further erode the occupational job base.'" (Def.'s Br. at 15 (citing quoting AR 01-1(3)).

the grids in the Medical-Vocational Guidelines alone to determine non-disability.  Id. at 273; Rojas-Velez, 2017 WL 969969, at *9.  Instead, the ALJ must also obtain "the testimony of a vocational expert or other similar evidence, such as a learned treatise," in order to carry his burden at the fifth step.  Id.  "Alternatively, the ALJ must provide the claimant with notice that he intends to take official notice of the fact that the claimant's non-exertional impairments do not erode the occupational base, and the claimant must have an opportunity to oppose that conclusion."  Rojas-Velez, 2017 WL 969969, at *9 (citing Sykes, 228 F.3d at 273)).

It is true that an ALJ also has the ability to rely on an SSR to avoid calling a VE.  In Allen, the Third Circuit held that if the Commissioner intends to rely on an SSR as a replacement for a VE, "it must be crystal-clear that the SSR is probative as to the way in which the non-exertional limitations impact the ability to work, and thus, the occupational base." 417 F.3d at 407 (emphasis added).  Here, the ALJ relied on two SSRs as a replacement for a vocational expert.  The ALJ's entire analysis of the SSRs in lieu of a vocational expert is: "Social Security Regulations state that limitations on the ability to climb ladders, ropes or scaffolds, stoop, kneel, crouch or crawl have little effect on the occupational base for light work.

Similarly exposure to unprotected heights, moving mechanical parts, and vibration have little effect (SSR's 83-14, 85-15). A finding of 'not disabled' is therefore appropriate under the framework of these rules." (Id. at 25). As noted above, the ALJ determined that Plaintiff possessed the RFC to: perform light work as defined in 20 CFR 416.967(b) except he can never climb ladders, ropes or scaffolds; he can occasionally climb stairs, stoop, kneel, crouch or crawl; he can frequently balance; he must avoid all exposure to unprotected heights, moving mechanical parts, or vibration; and he limited to unskilled work, involving simple, repetitive tasks and one to two step instructions. (Id. at 19).

The Court agrees with Plaintiff that the analysis by the ALJ of the non-exertional limitations is a cursory one sentence and does not meet the "crystal clear" standard required by the regulations. With respect to unprotected elevations, vibration and moving mechanical parts, none of the SSRs cited by the ALJ seems to stand directly for the proposition that they will not affect the occupational base.[3] Likewise, the SSRs cited do not

---

[3] For instance, with regard to vibration, SSR 85-15 discusses vibration (as a part of environmental restrictions) as follows:

> A person may have the physical and mental capacity to perform certain functions in certain places, but to do so may aggravate his or her impairment(s) or subject the individual or others to the risk of bodily injury. Surroundings which an individual may need to avoid

discuss the limitation of stairs on the Light Work category with particular clarity. It is somewhat telling that Defendant does a more detailed analysis than the ALJ in defending the determination, including citing to an SSR that the ALJ did not rely on in reaching his decision in this regard, SSR 96-9p. Accordingly, a limited remand is necessary on this issue.

---

because of impairment include those involving extremes of temperature, noise, and vibration; recognized hazards such as unprotected elevations and dangerous moving machinery; and fumes, dust, and poor ventilation. A person with a seizure disorder who is restricted only from being on unprotected elevations and near dangerous moving machinery is an example of someone whose environmental restriction does not have a significant effect on work that exists at all exertional levels.

Where a person has a medical restriction to avoid excessive amounts of noise, dust, etc., the impact on the broad world of work would be minimal because most job environments do not involve great noise, amounts of dust, etc.

Where an individual can tolerate very little noise, dust, etc., the impact on the ability to work would be considerable because very few job environments are entirely free of irritants, pollutants, and other potentially damaging conditions.

Where the environmental restriction falls between very little and excessive, resolution of the issue will generally require consultation of occupational reference materials or the services of a VS.

Id. (emphasis added). Here, the RFC indicated with respect to Plaintiff's conditions that he "must avoid all exposure to unprotected heights, moving mechanical parts, or vibration[.]"

Plaintiff also contends that the ALJ erred in assigning little weight to the opinion of Dr. Edward Maltz.  First, Plaintiff contends that in an on-the-record discussion with the ALJ, the ALJ agreed to hold open the record to permit neuropsychological testing of the Plaintiff for the purpose of providing this to Dr. Cohen, a medical expert in the case who testified that neuropsych analysis would be helpful in his analysis.  Plaintiff obtained this analysis from Dr. Maltz, but the ALJ never passed along the findings to Dr. Cohen.  Second, Plaintiff contends that the ALJ improperly assigned little weight to Dr. Maltz because he only treated Plaintiff one time, failed to provide specific functional limitations as opposed to broad generalized conclusions, and he opined on an issue reserved for the ALJ.  Finally, Plaintiff argues that despite discounting Dr. Maltz's comprehensive analysis, the ALJ assigned great weight to other doctors who never treated Plaintiff.

Defendant responds that, contrary to Plaintiff's argument, the ALJ clearly explained why he assigned Dr. Maltz's opinion little weight.  According to the ALJ's analysis, Dr. Maltz failed to provide specific functional limitations to broad generalized conclusions.  Moreover, Dr. Maltz made a general finding that Plaintiff had disabling limitations without explaining what those limitations were.  The Court agrees with Defendant and disagrees with Plaintiff's position at oral

argument that the ALJ improperly injected his own lay opinion. Rather, the ALJ discounted Dr. Maltz's opinion because it was premised on unsubstantiated conclusions reserved to the ALJ and was based only on a single meeting.  Accordingly, the ALJ did not err.[4]

Plaintiff additionally contends that the ALJ erred in assessing his credibility.  First, Plaintiff argues that it was incorrect for the ALJ to dock Plaintiff's credibility for his testimony that he admitted to no prior problems with employers, when in actuality Plaintiff just testified that he had not had a lot of encounters with employers, so he does not know what his problems are or are not.  It is not evident the ALJ even penalized Plaintiff's credibility for this factor.  Moreover, it appears to be a properly supported statement.  It is not false that Plaintiff admitted no problems with employers.

Second, the ALJ appears to have docked Plaintiff's credibility on pain and severity of his symptoms due to non-compliance with his treatment, despite Plaintiff's assertion that he testified that at least some portion of his non-compliance was due to his inability to pay for treatment.  (AR

---

[4] To the extent Plaintiff claims that the ALJ did not provide the report to Dr. Cohen, Plaintiff did not raise this before the Appeals Council, and admits as much.  [Docket No. 15].  Even so, even if Dr. Cohen had received Dr. Maltz's report, it is unlikely it would have been of any value to Dr. Cohen given its conclusory nature.

24, 44). Defendant admits that "[a]n ALJ cannot deny a claimant benefits based on the claimant's failure to obtain treatment she cannot afford." (Def.'s Br. 10); Gordon v. Schweiker, 725 F.2d 231, 237 (4th Cir. 1984). Defendant argues that instead of docking Plaintiff's credibility for non-compliance, the ALJ's citation of Plaintiff's non-compliance in this regard was to show that perhaps the treatments were not required.

Regardless of Defendant's arguments, the Court does not agree with Plaintiff that the record supports Plaintiff's argument that he testified to an inability to pay for treatment as the explanation for his non-compliance with treatment. Indeed, from Plaintiff's testimony it is not evident at all that he missed treatment due to his inability to pay, only that he had to call several neurologists before he could find one that would accept payment from him. (AR 50). Plaintiff never testified that the reason he did not follow up with Dr. Greenberg – who he had seen before – was that he was unable to pay for it. And, once Plaintiff was able to see Dr. Sheehan (whose prices he described as "extremely reasonable"), he was again non-compliant (even though he subsequently obtained insurance). (Id.) In all, the ALJ's credibility determinations can be fairly said to be supported by substantial evidence in this regard. As such, the Court finds no errors in the

credibility determinations of the ALJ as identified by Plaintiff on appeal.

An appropriate Order follows.

<u>s/Renée Marie Bumb</u>
RENÉE MARIE BUMB
United States District Judge

Dated: <u>June 9, 2017</u>